Gerald R. Boss (Georgia Bar No. 068775)
BossLawGroup@gmail.com
Boss Law Group, LLC
5531 Woodsong Trail
Dunwoody, GA 30338
Telephone: (404) 213-4024

*Attorney for Plaintiffs,*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## GEORGIA

| | |
|---|---|
| **StarPro, Greens, Inc.** a Georgia Corporation; | |
| | Civil Action No. _____ |
| **Daniel E. Selton,** an Individual Plaintiffs, | |
| v. | **COMPLAINT** |
| | **Demand for Jury Trial** |
| **Polyloom Corporation of America, a Delaware Corporation a/k/a TenCate North America and GreenFields**; and | |
| | District Judge _____ |
| **Challenger Turf, Inc.** a Georgia Corporation. | |

Plaintiff Starpro Greens, Inc., and Daniel E. Selton (hereinafter individually "StarPro", and " Daniel E. Selton") complain against Defendants Polyloom Corporation of America a/k/a/ TenCate North America and GreenFields, (hereinafter "TenCate North America")  and Challenger Turf, Inc. for the causes of action alleged as follows:

## NATURE OF THE DISPUTE

.     This action arises from Defendants repeated, willful, and egregious attempts to run Plaintiff StarPro out of business which efforts have proven to be successful.  In 2021, Defendants at their inviting and request enticed and lured StarPro into a business Partnership promising to develop and manufacture StarPro's one of a kind putting turf MPT for StarPro which StarPro had previously been known for in the industry and which Defendants needed StarPro's good will, industry knowledge and reputation to gain placement into this more exclusive putting turf market.  In addition to this one of a kind putting turf, Defendants acknowledged they would also provide ancillary synthetic turf products such as related putting border turf and lawn turf.   StarPro trusted Defendants based upon prior relationships and relied upon the assertions and

statements made by Defendants enticing StarPro to join Defendants in a Partnership.  Once StarPro became reliant to Defendants for the production of this one of a kind putting turf and related materials,  Defendants  kept the product for itself and ceased dealing with StarPro in 2022, leaving StarPro without the agreed upon one of a kind putting green to sell, effectively injuring StarPro's good will and business.

Even after damaging StarPro's goodwill and business upon ceasing to continue business with StarPro in 2022, Defendants in 2023 approached StarPro again to inquire if StarPro was interested in becoming a customer for the one of a kind putting green at a heavily inflated price.  Due to Defendants having a monopoly in the production of this one of a kind putting turf, StarPro had no alternative but to accept the higher price and purchase the product.  Deviously, Defendants reneged on delivering the agreed upon one of a kind putting turf and substituted an inferior product which resulted in multiple complaints, returns and all putting turf and putting green sales had to cease, thus putting the final nail in the coffin of StarPro.

Defendants utilized their superior position as manufacturers of synthetic turf to lure StarPro into a Partnership and reliance upon Defendants actions as the sole source of MPT putting turf available necessary for the sustainability of StarPro. Once StarPro committed to Defendants, Defendants systematically and deliberately

acted to put StarPro out of business.  They set their plan into action by reneging on their responsibilities and duties to StarPro in 2022 damaging the good will of StarPro and followed up in 2023 by enticing StarPro to rely on Defendants again to provide the MPT knowing StarPro's vulnerability to accept their offer due to their superior position.  Once StarPro accepted Defendants offer in 2023 to provide the MPT, Defendants subsequently destroyed the remaining goodwill of StarPro by failing to deliver the ordered MPT and substituted significantly inferior product which StarPro was forced to accept due to the outstanding orders.

Defendants' actions are in violation of Antitrust laws; breach of duty of loyalty and duty of care from the Partnership arrangement; breach of a fiduciary relationship; breach of a service agreement; breach of contract, breach of warranty and breach of underlying good faith; and fraud.  Upon which tort violations have severely injured the goodwill of StarPro causing significant emotional distress to  Daniel E. Selton who has an economic interest in StarPro.

# I.    INTRODUCTION

## A:  TENCATE NORTH AMERICA and CHALLENGER TURF

1.  Both Tencate North America and Challenger Turf Inc. are entities related to Tencate Grass .   TenCate Grass was established in the Netherlands in 1704 as a global group of market-leading companies engaged in creating the most innovative, highest quality synthetic grass surfaces for sports and landscaping. TenCate Grass is a multinational fully integrated operation from R&D, design and production to distribution, installation, and recycling.   TenCate Grass has annual revenues in excess of $650 million.

2.      TenCate Grass is a vertically integrated manufacturer, distributor, and installer of artificial turf solutions. The integration operation of TenCate Grass is accomplished via the acquisition of various synthetic turf related companies which contribute to some aspects of the creation, warehousing, and marketing of synthetic turf components.  Both Polyloom a/k/a/ TenCate North America and Challenger Turf were either acquired by or sold controlling interests  to TenCate Grass as an integral part of TenCate's Grass global acquisition strategy.  Based on these acquisitions, TenCate North America and Challenger Turf are entities with a common business plan as defined by TenCate Grass and upon information and

belief TenCate North America and Challenger Turf are controlled by TenCate
Grass to achieve the goals of the common business plan.

3.      TenCate Grass owns or controls various synthetic turf related companies
throughout the world.  In the Americas these companies include the following:

Academy Sports Turfs. Academy Sports Turfs which builds and maintains
premium sports surfaces;

GEO Surfaces.  GEO Surfaces designs, installs and maintains premium
sports surfaces.  This highly innovative installer is driven by the civil engineering
challenges it encounters in its area of business;

SGW Synthetic Grass Warehouse.  SGW Synthetic Grass Warehouse is one
of the largest companies in the synthetic turf landscaping market. Headquartered in
Southern California, it services the Southwestern USA, selling its products to
distributors, installers, consumers and via e-commerce;

GreenFields.  GreenFields produces hybrid turf and sustainable artificial
grass.  GreenFields is the global innovator in sports turf technology. Per the
corporate representative page on the well-known internet site Linkedin, the
url://www.linkedin.com/company/greenfields-usa/ is associated with the name
TenCate North America located in Dalton Georgia ;

TenCate Grass Components.  TenCate Grass Components is a global market leader in the development and manufacturing of synthetic turf yarns and backing. It is renowned for its focus on innovation, quality and high service level.

Challenger Turf Premium Synthetic Grass.  Challenger Turf is a worldwide supplier of premium synthetic turf for residential and commercial landscaping, golf, pet, and many other applications.  Its state-of-the-art new manufacturing plant guarantees the highest quality turf.  TenCate acquired a controlling share of Challenger Turf bringing Challenger Turf into the vertical and horizontal synthetic turf capabilities of TenCate North America in 2018.  Challenger Turf is a Georgia Corporation having a principal address of 743 Hill Rd, Dalton, GA, 30721;

Hellas.  Hellas is the largest full-service sports company in the U.S., specializing in the installation of sports surfaces, lighting, and facility amenities. With an unwavering commitment to quality and excellence, Hellas is a trusted partner in sports for K-12, collegiate, and professional teams coast-to-coast. From manufacturing and design to installation and ongoing maintenance, Hellas delivers superior products and services that improve athlete safety and enhance in-game experiences for athletes and fans alike;

GEO Sport Lighting.  GeoSport Lighting is a turnkey provider of high performing LED sport lighting 'plug and play' systems for the U.S. market,

including poles, cross arms, harnesses, boxes, controls, dynamic scenes and RGB capabilities and certified installers, both 'in house' and externally depending on the region of the country.

VPG.  Valley Precision Grading, Inc. is a full-service synthetic turf and track specialty contractor. We sell, install and maintain synthetic turf systems and also provide all construction services for tracks and fields.[1]

Polyloom Corporation of America was acquired by TenCate in 2010. Polyloom is a Delaware Corporation having a principal place of business at 1131 Broadway Street, Dayton, Tennessee.  Polyloom Corporation of America underwent two corporate assumed name changes which occurred simultaneously on July 14, 2021.  The first assumed name is TenCate North America Grass North America and the second is GreenFields which is assumed to relate to the aforementioned GreenFields.

TenCate North America utilizes the services of a warehouse identified with signage of TenCate North America located at 2640 Abutment Lane Dalton, Georgia.  TenCate North America is identified as being the Consignee of shipments from TenCate North America Thiolon Middle East LLC from the port of Jebel Ali United Arab Emirates and receiving shipments to Dalton at the address

---

[1] The corporate descriptions originate from TenCate's website.

of 2640 Abutment Lane Dalton, Georgia through the Georgia Ports Authority located in Savannah, Georgia.

4.      Upon information and belief, Mr. Joe Fields is the CEO of GreenFields, and TenCate North America.  With both of these companies being the name for Polyloom Corporation of America, Plaintiffs presume Mr. Joe Fields is also CEO of Polyloom Corporation of America.

Mr. Joe Fields is identified as one of four people comprising the Management Team of TenCate Grass. [2]

5.      In addition to the America operations, TenCate Grass owns or controls several operations in Europe, the Middle East and Africa.  These entities include the following:

CSC Sport.  CSC Sport is the Dutch market leader in the design, installation and maintenance of premium sport surfaces. Their expertise lies in sports fields for football, hockey, rugby, baseball and several smaller sports. Also, they are experts in installing and maintaining athletic tracks.

OPSA.  OPSA is at the forefront of the industry with its synthetic turf installations for an array of outdoor sports. Their goal is to find the best solutions

---

[2] From TenCate s website https:TenCategrass.com/about-us/management-team/

for their customers to ensure optimal capacity, quality and usability of sports facilities.

Tiger Turf.  TigerTurf is an industry leader in synthetic turf surfaces for the sports, education and landscaping markets. Working across all continents, TigerTurf sets the standard for design and manufacturing of synthetic turf. Always engineering with the highest quality products for optimal peak performance.

Evergreens UK Group.  Evergreens UK Group is the largest UK distributor of artificial grass surfaces, offering award-winning artificial grass products to consumers, contractors, and merchants. With their National Training Academy, they provide the industry's only accredited training award in fitting synthetic surfaces.

PST Sportsanlegg.  PST Sportsanlegg specializes in installation of the highest quality sports facilities across Norway. From artificial grass, synthetic surfaces, tennis surfaces, indoor flooring, padel, ball nets, and stadium fences to multi-courts, football goals, maintenance equipment and all other kinds of sports equipment.

Weitzel Sportstattenbau.   Weitzel Sportstättenbau, the specialist for the construction of sports fields such as football pitches, tennis courts, hockey fields and other sports facilities with more than 65 years of experience. Whether natural

grass, artificial turf or synthetic material, Weitzel offers passionate quality in Germany and throughout Europe. Weitzel offers the entire range of sports facility planning and construction from the green field, earthworks, drainage, substructure and surfacing from a single source.

6.     These international corporate entities illustrate that TenCate is an extremely sophisticated enterprise within the synthetic surface industry.  These entities primarily focus on the product and installation services for various synthetic surfaces in settings such as soccer fields and the like.

B.     DANIEL E. SELTON AND STARPRO, GREENS, INC

1. REVOLUTIONARY PUTTING INNOVATIONS

7.     Daniel E. Selton is an innovator having been granted multiple patents by the United States Patent and Trademark Office for his innovations.  Two such U.S. Patents are for an innovative golf ball putting cup entitled "Ball Receiver"  U.S. Patent No. 5,997,406 which issued in 1999 and "Putting Training Device" U.S. Patent No. 6,287,213 which issued in 2001. (hereinafter "Golf Ball Receiver")

8.     The Golf Ball Receiver is a unique golf putting cup for use with a putting mat to represent a putting green for an individual practicing at home.  The technology incorporated within the '406 and '213 Patents is a golf ball receiver

which utilizes a central shock absorber to be impacted by a rolling golf ball once the golf ball enters the receiver or putting cup.  If the speed of the golf ball is accurate such that in a real world situation, the golf ball is retained by the central shock absorber within the golf ball receiver.  Figure 1 from the '213 Patent illustrating this concept is reproduced below:

**U.S. Patent**          Sep. 11, 2001          Sheet 1 of 2          **US 6,287,213 B1**



9.  Prior to the Golf Ball Receiver innovations of Mr. Selton, indoor putting targets included glass cups turned on their side or semi-volcano structures which included uprising sidewalls which were necessary in order to define an internal

receptacle to catch a golf ball and represent a putting hole. A representative figure of such a structure is reproduced below:



**U.S. Patent**          Jan. 30, 1996          Sheet 1 of 2          **5,487,545**

Fig. 1

10.     The primary obstacle of the prior golf ball receivers were that they did not accurately represent a true putting surface which incorporates a golf hole defined within a flat grass surface. By utilizing side walls, a golfer would need to accelerate the speed of the golf ball in order to be successful in overcoming the rise of the sidewalls thereby training the golfer to overstrike the golf ball. Mr. Selton's innovation enabled a flat surface to be utilized, akin to a natural occurring putting hole, thereby training a golfer to hit the golf ball so it would "die" into the cup.

13

11.     Mr. Selton's innovative Golf Ball Receiver was especially adaptive to an artificial putting surface as it would naturally fit within a putting hole defined within the putting surface.  This was especially true for indoor putting surfaces as outdoor putting surfaces could have a hole dug within the ground just as a natural golf putting green would have.

12.     With the success of the Golf Ball Receiver Mr. Selton incorporated StarPro, Greens, Inc.  in 2006.  StarPro, Greens, Incorporated is a Georgia Corporation having a principal place of business at 1640 Spinnaker Drive Alpharetta Ga 30005.   Daniel E. Selton has an economic interest in StarPro, Greens, Incorporated.

## 2.  MASTER PUTTING TURF

13.     With the advent of the Golf Ball Receiver technology, Mr. Selton worked with a group of individuals at a Company to develop a putting surface which it has deemed best in the world – the Master Putting Turf (hereinafter "MPT putting turf").     Through a combined effort the MPT putting turf was created.

14.     A key attribute of the MPT putting turf is that the synthetic fibers are cross-over stitched into the backing and subsequently coated.  The cross-over stitched profile creates a unique putting surface which is omnidirectional meaning that the fibers do not have a grain and that the stimp speed (stimp speed is determined by

applying a known velocity to a golf ball and measuring the distance traveled in feet)
of the surface is similar in any direction approaching the Golf Ball Receiver.  Other
technologies create a putting surface which has a grain wherein the stimp speed of
the putting surface has a certain value in one direction, such as east to west, and
another stimp speed of a significantly different value north to south.  The MPT
putting turf  is uniform creating a unique putting surface.   Additionally, the MPT
putting turf has an embossed rubber backing which provides additional benefits to the
do-it-yourself installer.  If the MPT putting turf is intended for indoor usage, the
embossed rubber backing provides a frictional surface to maintain the MPT putting
turf in contact with flooring.  If the MPT putting turf is intended for outdoor usage,
the MPT putting turf's embossed rubber backing is best suitable for do-it-yourself
installers as the embossed backing  can accommodate imperfections in the prepared
ground surface.

15.     At the time the MPT putting turf was developed at this Company with
David Calhoun, it was the only manufacturing source of cross-over stitched putting
surfaces.

16. StarPro sold their MPT putting turf for installation by do-it-yourself home
installers.  In addition to the selling of MPT putting turf, ancillary items were
customarily packaged such as cups, flags, synthetic turf borders and synthetic turf.

Through the unique MPT putting turf experience for the do it yourself home installer that combines the ability to pair the MPT putting turf with additional synthetic products such as putting turf and borders with inground cups or the unique Golf Ball Receiver, StarPro established an exceptional reputation.  The name StarPro has obtained significant goodwill by the do-it-yourself home installer industry.  Also, with the customer relations which StarPro developed, Mr. Selton became an expert in the do-it-yourself market identifying customer demands and what features were the most important and successful in the marketplace.

17.    In 2020, the Company which manufactured the MPT putting turf for StarPro determined to cease providing the MPT putting turf to StarPro for their home installers and do it yourself individuals.

18.    The decision in 2020 to cease selling the MPT putting turf to StarPro eliminated a product from the individual consumer marketplace.  In essence the total market was removed.

II.      PARTNERSHIP BETWEEN TENCATE NORTH AMERICA,

CHALLENGER AND STARPRO

1.  THE COURTSHIP

19.     In 2020, with the termination by the Company to sell MPT putting turf to StarPro, StarPro looked to alternative companies to Partner with the development of the MPT putting turf.

20.     In 2020, David Calhoun who previously worked with Mr. Selton in the development and manufacturing of the MPT putting turf at the Company was now employed at Defendant as Challenger Turf as VP of Sales and Manufacturing (hereinafter "Challenger Turf's VP of Sales & Manufacturing").   Challenger Turf's VP of Sales & Manufacturing was aware of the significant goodwill which StarPro had established in the do-it-yourself putting turf installation community and StarPro's established reputation and success that was built by selling the best putting turf in the industry, the MPT putting turf.

21. Challenger Turf's VP of Sales & Manufacturing had an agreement in place with the Company wherein he could not solicit customers of the Company.  This Agreement terminated in early 2020.

22.     Upon information and belief, Challenger Turf's VP of Sales & Manufacturing was aware that Defendant, Challenger Turf sold putting turf which was inferior to the MPT putting turf and that Defendant, Challenger Turf was not successful in the do-it-yourself putting turf marketplace. Upon information and belief, Challenger Turf's VP Sales & Manufacturing approached TenCate North America management to discuss extending an invitation to Mr. Selton to utilize Mr. Selton as a consultant into the do-it-yourself putting green turf sales and installer market and to utilize StarPro's reputation in the do-it-yourself installer industry to expand Challenger Turf's putting turf market and associated peripheral turf products.

23.     Upon the termination of his non-solicitation agreement in 2020, Challenger Turf's VP of Sales & Manufacturing with the approval of TenCate North America approached Mr. Selton to inquire if StarPro would be interested in Partnering with Challenger Turf and TenCate North America to assist Challenger Turf in reaching out to trade markets through the StarPro organization.

24.     A meeting was conducted at the Challenger Turf facilities around August 2020.   In attendance at this meeting was David Calhoun in the role of Challenger Turf's VP of Sales & Manufacturing  acting on behalf of Challenger Turf, Daniel E. Selton for StarPro and Mr. Joe Fields representing TenCate North America. At  this meeting, it was discussed how the entities would Partner together so that

Challenger Turf could expand into the do-it-yourself putting turf installers marketplace utilizing StarPro's resources and goodwill.  The Parties would work together in a Partnership with each entity providing different services relating to the sales of MPT putting turf to the do-it-yourself market.  Challenger Turf with StarPro and Mr. Selton would develop  and manufacture exclusively for sale by StarPro the MPT putting turf. TenCate North America would provide warehousing, cutting services and shipment of the MPT putting turf, and associated turf products and StarPro would provide sales and marketing along with consulting efforts in developing the  MPT.

25.     Challenger Turf and TenCate North America knew at the time of this meeting that no synthetic turf manufacturers made MPT putting turf for the do-it-yourself putting turf individuals and/or installers or was accessible for purchase by StarPro.  Thus, Challenger Turf and TenCate North America knew they would be creating a monopoly in being the sole manufacturer and supplier of MPT to StarPro and the do-it-yourself installer marketplace regarding MPT putting turf.

26.     Challenger Turf and TenCate North America knew at the time of this meeting that the creation of the MPT putting turf product is not easily done and would not be done quickly due to the complexity of the manufacturing of the MPT putting turf.  Once the Partnership was created, in August of 2020, the MPT putting

turf was not ready for sale until August 2021.  Even with Challenger Turf's VP of

Sales and Manufacturing's prior knowledge in manufacturing the MPT, a yearlong

development effort was necessary to complete the MPT putting turf manufacturing

process.

27.    Challenger Turf and TenCate North America knew at the time of this

meeting that StarPro was vulnerable to the manufacturing capabilities of its Partners

and could only succeed if its Partners delivered the MPT putting turf product as

discussed.  Challenger Turf and TenCate North America knew that due to the long

lead time in developing the MPT putting turf, that StarPro was reliant on Challenger

Turf and TenCate North America honoring their Partnership responsibilities in order

to have a product for the do-it-yourself installer marketplace in the latter part  of 2021

and for future years including 2022.

28.  Challenger Turf and TenCate North America knew that being the entities

with the manufacturing capabilities, they held a superior position to StarPro and had

the power to exercise a controlling influence over the will, conduct and interest of

StarPro by controlling the provision of MPT putting turf to StarPro.  These

circumstances defined a confidential relationship between StarPro and Challenger

Turf/TenCate North America.  Because of StarPro's prior relationship with

Challenger Turf's VP of Sales and Manufacturing,  StarPro trusted and relied upon

the promises of Challenger Turf to provide exclusively to StarPro the MPT putting turf product and in sufficient quantities to enable StarPro to be a successful and viable company reaching its maximum potential.

29.     Challenger Turf with TenCate North America forecasted that they would produce the quantity of MPT putting turf and associated turf products which would make StarPro a $2 million dollar annual client for Challenger Turf.

30.     Challenger Turf and TenCate North America became the sole source of MPT putting turf for do-it-yourself installers in the United States, creating a monopoly of MPT putting turf for sale to the consumers exclusively by StarPro.

31.     The Parties shared in the profits of this Partnership.  Challenger Turf at the direction of StarPro would engage in a run of the MPT putting turf for sale by StarPro.  No costs were incurred by StarPro in this endeavor until a sale by StarPro was made.  In this relationship, the entities shared in the profits of this common business enterprise.   Challenger Turf would manufacture the product at StarPro's direction, TenCate North America North America would warehouse the MPT putting turf and cut the product when required and StarPro would act as the sales agent of the Partnership and solicit sales.  When a sale was incurred, StarPro would generate a Purchase Order to Challenger Turf and remit payment for the Purchase Order.  Only

when a sale was made by StarPro would profits be simultaneously realized by all the entities.

32.     At the time of the meeting in 2020, Challenger Turf sold a golf putting surface product identified in Envylawn's line of products, and which like the prior Company provided project installation surfaces for their products.  StarPro's involvement in the Partnership was requested by Challenger Turf's VP of Sales and Manufacturing  due to StarPro's reputation in the do-it-yourself putting green industry and the goodwill StarPro had created in this market in addition to the consultant services of Dan Selton who was one of the most knowledgeable individuals in the do-it-yourself putting turf installer market by his years of one on one experiences with such installers.

33.     Prior to the 2020 meeting, Challenger Turf did not manufacture a cross-over stitched putting surface in general or a putting turf with the characteristics of the MPT putting turf.   Challenger Turf needed StarPro as a Partner and Mr. Selton as a consultant in order to reach a market it had not encountered with a product necessary to enter into the high end do-it-yourself market.

34.     StarPro's agreement to Partner with Challenger Turf and TenCate North America provided the economic incentive for Challenger Turf and TenCate North

America to undergo the development of the MPT putting turf with the assistance of Mr. Selton.

35.     In the meeting, Challenger Turf's VP of Sales and Manufacturing and Joe Fields present on behalf of TenCate North America, acknowledged that the forecasted target sales of the Partnership through StarPro was $2 million dollars per year of the Partnership.

36.     In essence, the motivation for Challenger Turf and TenCate North America to engage in developing MPT putting turf exclusively for StarPro and enter into a partnership with StarPro, was the additional $2 million dollar revenue to Challenger Turf and TenCate North America. Based upon these promises, StarPro entrusted Challenger Turf and TenCate North America to provide the MPT putting turf necessary for StarPro to be a successful and viable business and continue operations based upon the good will it had established with the do-it-yourself installer community.

2.     THE RELATIONSHIP

37.     In view of the Partnership and StarPro's reliance on the promises of Challenger Turf and TenCate North America, StarPro instructed Challenger Turf to initiate a run of MPT putting turf in February of 2021 for the upcoming primary sales season. The synthetic turf commercial retail season for the do-it-yourself installer

commences prior to the start of spring and continues through the end of September. Challenger Turf did not produce an MPT putting turf product for sale by StarPro until August 2021.

38.  When a run was completed, Mr. Selton would personally visually inspect the rolls to ensure the quality of the MPT putting turf product.  If acceptable, Mr. Selton would note the respective roll ID numbers and place orders utilizing the roll ID numbers to ensure the quality of the MPT putting turf product sold by StarPro.

39.  When an order from a do-it-yourselfer was received by StarPro, StarPro would submit a Purchase Order to Challenger Turf for cutting and shipping a MPT putting surface.  If associated borders or other turf products were desired, such items would also be placed via a PO.  Only through a PO placed by StarPro as a result of a purchase from a do-it-yourself installer would Challenger Turf and TenCate North America receive payment for the MPT putting turf rolls requested by StarPro.

40.  Based on the success of the 2021 MPT putting turf campaign, Challenger Turf's VP of Sales and Manufacturing, as a representative of Challenger Turf, met with Mr.  Selton as a representative of StarPro in early 2022 to inquire if StarPro was interested in maintaining the Partnership for 2022.

41.  Based on the actions of Challenger Turf and TenCate North America North America successfully honoring their duties and obligations in delivering a

quality MPT putting turf product and providing the necessary warehousing, cutting and shipping responsibilities, StarPro agreed it would continue the Partnership and act as the sales agent for the Partnership.  Challenger Turf and StarPro discussed that the expected deliverables from Challenger Turf to StarPro would be $2 million dollars of synthetic turf for the 2022 year.

42.   As in 2021, in 2022 StarPro instructed Challenger Turf to initiate production of MPT putting turf based on future sales.  As in 2021, no monies were paid by StarPro until a Purchase Order for inspected goods was initiated by StarPro based on an order from do-it-yourself customers.

### 3.     CHALLENGER TURF AND TENCATE NORTH AMERICA'S CHANGE IN BEHAVIOR IN 2022

43.   In early 2022,  Challenger Turf's VP of Sales and Manufacturing, whom Mr. Selton had a relationship with was released from his employment at Challenger Turf.

44.   Prior to Challenger Turf's VP of Sales and Manufacturing being released from his employment at Challenger Turf in early 2022, StarPro had a Purchase Order in place with Challenger Turf for initiating a substantial run of MPT putting turf which StarPro needed as inventory on hand to satisfy forecasted orders for the Spring 2022 Season.   However, for this order, Challenger Turf abruptly increased the price

for the MPT putting turf by 38.77%  which exceeded all inherent cost increases of the materials and labor associated with manufacturing the MPT putting turf.  This cost increase was retroactively applied to all previously submitted and paid for orders further damaging StarPro and in breach of the duty of loyalty and duty of care owed to StarPro as a Partner.

45.  When the StarPro requested run was completed, Mr. Selton inspected the MPT putting turf produced from this run at the TenCate North America warehouse and approved of the quality.  Upon inspection, Mr. Selton was given  a list of the roll numbers of the inspected MPT putting turf.  .

46.  As was customary procedure within the Partnership, StarPro upon approval of the inspected MPT putting turf , placed Purchase Orders for the cutting and shipping of orders from the MPT putting turf inventory based on orders submitted by customers of StarPro.  As was customary procedure within the Partnership, no monies were received by Challenger for the MPT putting turf inventory until orders were submitted by StarPro, in this manner the Parties shared in the profits of the common enterprise.

47.  However, when StarPro issued the customary purchase orders for the MPT putting turf produced from this initial Spring 2022 Run, StarPro was informed by Challenger Turf that the MPT had been converted by Challenger Turf for its own

use and sold to an entity other than StarPro.  StarPro had a right to this inventory as it was produced at the request of StarPro under the customary Partnership arrangement. StarPro was denied its interest in the property by the Defendant's unauthorized act and StarPro suffered damages due to this conversion.

48.   This conversion was in breach of the fiduciary duty, duty of care and duty of loyalty which TenCate North America  and Challenger Turf owed StarPro.  This conversion resulted in severe damage to StarPro's goodwill as multiple orders from do-it-yourself installers were rescinded.  Additionally, this act was in direct contravention of the agreement of the parties that the MPT putting turf would be exclusively manufactured by Challenger Turf for StarPro.  This exclusivity promise was consideration for StarPro to agree to become the exclusive agent for MPT putting turf for TenCate North America and Challenger Turf at the onset of the Partnership a year earlier.

49.   Upon information and belief, once Challenger Turf's VP of Sales and Manufacturing  was terminated by Challenger Turf, Challenger Turf had no intention of delivering the requested MPT putting turf to StarPro even though StarPro had engaged in customary practices in directing Challenger Turf to manufacture the MPT putting turf and subsequently inspected the manufactured goods.  StarPro relied on the material misrepresentation that the produced MPT putting turf would be available

under the customary Partnership arrangement.  This act of fraud by Challenger Turf and TenCate North America, caused StarPro significant injury in loss to its goodwill and such fraud was intentionally aimed at damaging StarPro.  Challenger Turf and TenCate North America knew from the Partnership with StarPro that Challenger Turf and TenCate North America had a monopoly in the creation of MPT putting turf for the do-it-yourself installer and that StarPro would not have an alternative source of product to honor purchase orders for the MPT putting turf placed and which fulfillment was dependent on the inventory of MPT putting turf requested by StarPro. Challenger Turf and TenCate North America knew that denying the MPT putting turf inventory to StarPro would result in embarrassing StarPro to its customers by failing to fulfill orders already received by StarPro from these customers and damage the goodwill of Starpro.  Challenger Turf benefited by this fraudulent maneuver by both simultaneously damaging the reputation of StarPro by its inability to satisfy its customer base while simultaneously improving its own reputation by being a supplier of MPT putting turf which prior to this event did not occur.  By intentionally denying StarPro with this inventory, after leading StarPro with the understanding that the inventory would be available, Challenger Turf and TenCate North America open themselves up to punitive damages based on their specific intent to cause harm to StarPro.  Additionally, specific damages to the good will and loss of the value of

business sustained by StarPro are a result of Challenger Turf's and TenCate North

America's actions.

50.    With Challenger Turf and TenCate North America refusing to supply

StarPro with the requested MPT putting turf along with all other ancillary turfs,

StarPro representative Dan Selton and his employee Barbara Saren received multiple

harassing calls from customers who had ordered MPT putting turf and which orders

were not fulfilled.  Dealing with the constant complaints from customers and with the

thought of the potential demise of their business, which they had created and been

involved in daily for over 15 years brought severe emotional distress to Mr. Selton.

This distress was intentionally created by Challenger Turf and TenCate North

America by knowingly denying access to the MPT putting turf inventory which Dan

Selton had requested and personally inspected anticipating that the MPT putting turf

inventory was available to StarPro to satisfy the respective orders.  The act of

Challenger Turf and TenCate North America in denying StarPro access to the MPT

putting turf inventory was malicious, willful and wanton and done knowing the

associated economic injury of such acts would cause damage to the goodwill and

economic property of StarPro.

51.  This denial of MPT putting turf inventory to StarPro is also a breach of duty of loyalty and duty of care which Challenger Turf and TenCate North America owed to StarPro from the Partnership.

52.  This denial of MPT putting turf inventory to StarPro is also a breach of the fiduciary duties which Challenger Turf and TenCate North America owed StarPro.

### 4.   THE DIVORCE

53.  Subsequent to the conversion of the MPT putting turf inventory by Challenger Turf, Challenger Turf instructed StarPro that it would no longer sell any turf products (ancillary or MPT putting turf) to StarPro.  This rescission by Challenger Turf and TenCate North America pulled the rug out from underneath StarPro causing StarPro significant injury and loss to its overall sales  and goodwill. Such acts were intentionally aimed at damaging or destroying StarPro.  Challenger Turf and TenCate North America knew from the Partnership with StarPro that Challenger Turf and TenCate North America had a monopoly in the MPT putting turf for the do-it-yourself installer and that StarPro would not have an alternative source of product to honor purchase orders for the MPT putting turf and any ancillary products.  Challenger Turf and TenCate North America knew that denying the MPT putting turf inventory to StarPro would result in embarrassing StarPro to its customers and damage the goodwill of Starpro.  Challenger Turf benefited by this

fraudulent maneuver by both simultaneously damaging the reputation of StarPro by its inability to satisfy its customer base while simultaneously improving its own reputation by being a supplier of MPT putting turf which prior to this event did not occur.  By intentionally denying StarPro with all inventories, after leading StarPro with the understanding that the inventory would be available, Challenger Turf and TenCate North America  open themselves up to punitive damages based on their specific intent to cause harm to StarPro.

54.  The act of Challenger Turf and TenCate North America luring StarPro into a Partnership by enticing StarPro with the MPT putting turf product was done with the intention of making StarPro reliant upon Challenger Turf for the MPT putting turf as Challenger Turf with the assistance of Mr. Selton in developing the MPT had a monopoly on the manufacturing of MPT putting turf for the do-it-yourself installer industry.  Challenger Turf and TenCate North America knew that they had a superior position over StarPro and could influence StarPro's behavior based upon their superior position of being the exclusive supplier of the product which StarPro sold.

55.  Challenger Turf and TenCate North America planned on damaging StarPro to the extent that StarPro would be forced out of business to the benefit of

Challenger Turf's Envylawn putting turf business leaving Envylawn as the sole provider of MPT putting turf.

56.   Challenger Turf and TenCate North America needed the goodwill and reputation of StarPro to enable Challenger Turf and TenCate North America to introduce their version of the MPT putting turf to the do-it-yourself installer market. Once the monopoly had been created, Challenger Turf and TenCate North America abused the monopoly by excluding StarPro as a supplier of the MPT putting turf to the public and hence exclude competition.

57.   Terminating the supply of MPT putting turf by Challenger Turf and TenCate North America to StarPro is an exclusionary practice with the sole attempt to exclude StarPro as a rival.  Such exclusionary practice is excessively predatory as Challenger Turf and TenCate North America specifically knew that StarPro was reliant upon their monopolistic supply of MPT putting turf as Challenger Turf and TenCate North America lured and enticed StarPro into assisting in the development of the MPT putting turf product by Challenger Turf and TenCate North America only to unilaterally terminate being a source of MPT putting turf to StarPro once StarPro had committed its reliance on the supply of MPT putting turf from Challenger Turf and TenCate North America.

58.   Challenger Turf's and TenCate North America's acquisition of the MPT putting turf monopoly was not developed through efficiency but solely through the elimination of StarPro as a supplier of the MPT putting turf.

59.   The termination by Challenger Turf and TenCate North America of providing MPT putting turf to StarPro denies consumers of a source of MPT putting turf at a lower price than available from StarPro.  Challenger Turf maintained selling the MPT putting turf  establishing themselves as the sole source of MPT.

60.   The exclusionary practice of terminating the provision of MPT putting turf to StarPro occurred right at the beginning of the seasonal market for demand for putting surfaces for do-it-yourself installers.  While StarPro acted diligently in requesting Challenger Turf to produce a run of MPT putting turf for StarPro to acquire to initiate sales and satisfaction for the initial seasonal demand for MPT putting turf, Challenger Turf strategically denied the requested run of MPT putting turf and all ancillary turfs to StarPro embarrassing and damaging the goodwill of StarPro.  Challenger Turf and TenCate North America's action in terminating the relationship was willful and malicious.

61.   Based on Challenger Turf's and TenCate North America's actions resulting in StarPro's inability to satisfy its clients, StarPro's goodwill was significantly damaged in 2022.

62.     Based on Challenger Turf's and TenCate North America's actions in terminating the supply of MPT putting turf to StarPro, StarPro's business valuation was significantly damaged due to the loss sales and profits.

### 5.     FINAL NAIL IN THE COFFIN

63.     After Challenger Turf and TenCate North America determined to cease providing MPT putting turf to StarPro, StarPro initiated efforts to find an alternative supply.

64.     In the later part of 2022, David Calhoun, the former VP of Sales and Manufacturing now at a new company with the alleged capabilities of developing MPT putting turf approached Dan Selton to inquire if Dan was interested in this new company and the possibility of trying to recreate the MPT putting turf.  Mr. Selton stated  he would be interested.

65.     At the beginning of 2023, David Calhoun had yet to fully commit to development of the MPT putting turf knowing that Challenger Turf had required over a year to develop the MPT putting turf.

66.     Even after informing StarPro they would not sell him any products after 2022, Challenger Turf approached StarPro in early 2023 prior to the start of the MPT putting turf business season for retailing the MPT putting turf again to do-it-yourself

installers.  StarPro reminded Challenger Turf that Challenger Turf had notified StarPro in 2022 just prior to the start of the 2022 MPT sales season that Challenger Turf would cease selling MPT putting turf and related synthetic turf products to StarPro; nonetheless, Challenger Turf reiterated its desire to have StarPro as a customer.

67.     With the new courting by Challenger Turf, StarPro specifically requested that Challenger Turf provide MPT putting turf to StarPro.  Challenger Turf responded that the MPT putting turf was propriety to their Envylawn line of products and would not be available to StarPro.  StarPro reiterated that MPT putting turf was the only putting surface which StarPro sold and only MPT putting turf would be desired.  Challenger Turf acquiesced and promised StarPro that MPT putting turf would be made available to StarPro.  StarPro subsequently placed an initiating PO to direct the manufacturing of a run. StarPro subsequently paid full value for the MPT run upon the product and paid for the run of MPT up front prior to the manufacturing of the MPT product.

68.     StarPro received orders for MPT putting turf from do-it-yourself installers based on the future product run ordered from Challenger Turf.

69.     Challenger Turf made a putting turf run based on StarPro's initiating purchase order and informed StarPro that the putting turf inventory was ready for

inspection.   Mr. Selton inspected the run of putting turf and determined that the putting turf which Challenger Turf had manufactured was not MPT putting turf per the items identified in the resepective PO.  StarPro was under duress to fill these delinquent/backlogged  2023 orders and took possession of the fraudulently substituted putting turf even though it was not MPT putting turf.

70.    Soon after receiving the substituted putting turf and filling all backorders, complaints came in regarding the loss of integrity of the product.  The nylon fibers were inferior and "relaxed/straightened" thus destroying the integrity of the product because the stimp value slowed to approximately 7 on the stimp meter. Seven on the stimp meter is unacceptable to golfers because the ball rolls too slowly for realistic putting.  The StarPro MPT putting turf normally was approximately 10 on the stimp meter (country club speed).   Based on the poor performance of the product, customers called StarPro, complaining and irate at being sold bad turf and requesting their money back, which StarPro did.  It is estimated that approximately 70% of all products sold from this fraudulently substituted and defective product was rejected or returned.

71.    StarPro met with Challenger Turf to discuss the unacceptable substitution of product and requested reimbursement for the bad turf.   Challenger Turf has refused to refund the money for the bad turf or honor its factory warranty.

72.     From the outset of 2023, Challenger Turf had no intention of assisting StarPro in its core business.  Challenger Turf lured StarPro to do business with them in 2023 and to cease working with David Calhoun in creating MPT putting turf for the 2023 season.  Challenger Turf informed StarPro that the MPT putting turf product was proprietary to their own entity Envylawn and would not be available to StarPro, StarPro informed (reminded) Challenger Turf that MPT putting turf was StarPro's product before Envylawn's product and that only MPT putting turf was acceptable. After Dan Selton's insistence, Challenger Turf informed StarPro that the MPT putting turf would be made available to StarPro.  StarPro relied upon this statement and placed the initiating PO which would provide StarPro with inventory for the start of the 2023 putting season.  Due to the product produced which was not MPT putting turf, upon information and belief, Challenger Turf had no intention of manufacturing MPT putting turf for StarPro.  The substituted product was not in error, but calculated to again harm and embarrass StarPro just as a new putting turf season started.  This was the second year in the row that Challenger Turf pulled the rug out from under StarPro resulting in StarPro lacking any inventory of MPT putting turf for the upcoming season and putting StarPro essentially out of business and destroying the good will which StarPro had.

73.   The actions of Challenger Turf warrant special damages. Dan Selton is 70 years old and intended to sell StarPro.  The valuation of the business is based upon

the good will and strength of sales over a specific period of time. Typically, a

minimum of three years is required. If Challenger Turf had honored their agreed

upon provision of MPT putting turf to StarPro, the StarPro sales figures based on $2

two million dollars in total turf sales (projected by their VP Sales and Manufacturing)

from Challenger Turf, StarPro would have had expected revenues in the millions.

With the cost evaluation of this business based on an industry factorial, StarPro

would have been worth several million dollars. However, due to Challenger Turf and

TenCate North America's actions, StarPro has had marginal sales and the business

maybe totally lost due to Challenger Turf's and TenCate North America's actions in

damaging the goodwill of StarPro.

### III.  ANTITRUST REQUIREMENTS

### RELEVANT MARKETS

74.     Challenger Turf and TenCate North America's conduct at issue in this

Complaint implicates two relevant antitrust market in the United States:  Artificial

putting surfaces constructed from synthetic fibers tufted into a backing in a cross-

over stitched manner to produce a putting surface having a stimp value of between

9.5 to 11 as measured using standard practices for the do-it-yourself installer.  The

artificial surface includes an embossed rubber backing.   Also, the StarPro market

which entails the provision of artificial putting surfaces constructed from synthetic

fibers tufted into a backing in a cross-over stitched manner to produce a putting

surface having a stimp value of between 9.5 to 11 as measured using standard

practices for the do-it-yourself installer to StarPro.

A.     GEOGRAPHIC MARKET

75.     North Georgia is replete with synthetic turf manufacturers that have the

capabilities of manufacturing synthetic putting turf and associated synthetic border

materials which includes synthetic lawn turf.  As the MPT putting turf product is

customarily sold with the associated synthetic border material and lawn turf, the

ability to manufacture all components is essential.  This is especially true since the

quality of the MPT putting turf is guaranteed by the physical inspection of Mr.

Selton who resides in Fulton County Georgia and needs convenient access to the

manufacturing facilities.

B.  PRODUCT MARKETS

I.  Cross-over stitch putting mat

76.     The first relevant product market is artificial putting surfaces

constructed from nylon synthetic artificial turf fibers tufted into a backing in a cross-

over stitched manner to produce a putting surface having a stimp value of between

9.5 to 11 as measured using standard practices for the ddo-it-yourself installer.  The

artificial surface includes an embossed rubber backing.   The cross-over stitched nature of the nylon synthetic artificial turf fibers provides the putting surface with very little grain in any/all directions.  This arrangement enables an individual putting on this surface to experience equal stimp values on the putting surface regardless of the direction of putting into a putting cup.   This product will be referred to as the MPT putting turf.  Upon information and belief, Challenger Turf through their Envylawn product group may refer to this product under another name.

The MPT putting turf market for do-it-yourself installers was only satisfied by StarPro.  Only Challenger Turf/Tencate North America existed to supply the MPT to StarPro and hence had a monopoly on the MPT for do-it-yourself installers.

This relevant market does not include general putting turf made by synthetic yarns.  Cheaply made and poorly performing putting turf is not in the same market as the more sophisticated cross-over stitched constructed putting turf.   The cross-over stitch process is more elaborate than that used in the other poor performing putting turf and produces a unique result.

II.     StarPro MPT Putting Turf

77.     The second relevant product market is the market of artificial putting surface constructed from nylon synthetic artificial turf fibers tufted into a backing in a cross-over stitched manner to produce a putting surface having a stimp value of between 9.5 to 11 as measured using standard practices having an embossed rubber backing  for the do-it-yourself installer which is accessible to StarPro for selling to consumers.  Only the MPT manufactured by Challenger Turf exclusively for StarPro was available to StarPro.  No other entity would manufacture or sell cross-stitched putting turf to StarPro.  Challenger Turf did not manufacture a cross-over stitched artificial putting turf surface prior to developing a working relationship with StarPro. Only upon StarPro creating the MPT putting turf market for Challenger Turf and TenCate North America, did Challenger Turf initiate production of the MPT putting turf. Without StarPro, Challenger Turf and TenCate North America would not have initiated production of the MPT putting turf.  StarPro was the market for Challenger Turf's MPT putting turf and Challenger Turf was the sole source of MPT accessible to be purchased by StarPro.  StarPro was reliant to Challenger Turf for the MPT products produced by Challenger Turf which were only source of MPT putting turf available to StarPro.

This relevant market does not include general putting turf made by synthetic yarns. StarPro in prior years only sold cross-over stitched putting turf. This was how the reputation and good will of StarPro was created – by providing do-it-yourself installers with the best putting turf available. The cross-over stitched yarns provide for a unique putting experience wherein the stimp value of the green is consistent in every direction. Such performance is not attainable by other putting turfs. By Challenger Turf and Tencate North America agreeing to provide this cross-over stitched putting turf exclusively to StarPro, the StarPro market was created. Since Challenger Turf was the only entity providing this cross-over stitched putting turf to StarPro, they created and held a monopoly.

Challenger Turf/Tencate North America engages in, and its activities substantially affect, interstate trade and commerce. Challenger Turf/Tencate North America provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.

### III. VENUE AND JURISDICTION

78.     Plaintiffs bring this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Challenger Turf's and TenCate North America's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

79.     This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331 and 1337(a).

80.     This Court has supplemental subject matter jurisdiction over the remaining State claims. 28 U.S.C. § 1367.

81.     The Court has personal jurisdiction over Challenger Turf as a Georgia Corporation.

82.     This Court has personal jurisdiction over Polyloom as Polyloom operates a business in this District, owns property in this District and engages in sufficient constant activities to warrant jurisdiction.

83.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because both Polyloom and Challenger Turf transact business and is found within this District.

# IV.  VIOLATIONS ALLEGED

### *First Claim for Relief: Monopolization of the Cross-over stitched putting surfaces for do-it-yourself installers in Violation of Sherman Act § 2*

84.    Plaintiffs incorporate the allegations of paragraphs 1 through 77 above.

85.    Cross-over stitch putting surfaces for do-it-yourself installers with the manufacturer being in North Georgia is a relevant antitrust market, and Challenger Turf/TenCate North America has monopoly power in that market.  Challenger Turf/TenCate North America is the sole manufacturer in North Georgia of MPT putting turf for the do-it-yourself installer.

86.    Challenger Turf/TenCate North America has unlawfully monopolized the cross-over stitch putting surfaces for do-it-yourself installers market through a course of exclusionary conduct described herein. While each of Challenger Turf/TenCate North America's actions increased, maintained, or protected its cross-over stitch putting surfaces for the do-it-yourself installers market; the following exclusionary conduct—taken together—played a particularly important role in unlawfully establishing or maintaining the monopoly:

(1)   Terminating the Partnership with StarPro preventing the Consumer from acquiring MPT putting turf from StarPro resulting in higher prices to the Consumer by the elimination of a source of the MPT putting turf product. The termination of providing MPT to StarPro was done in order to pursue the goal of dominance of the cross-over stitched putting surface across the do-it-yourself installers market;

(2)   The exclusionary practice of removing a competitor in the do-it-yourself industry by luring StarPro into a relationship wherein StarPro relied upon Challenger Turf/TenCate North America to develop the MPT putting turf solely for StarPro, and wherein Challenger Turf/TenCate North America was the sole source of MPT putting turf available to StarPro. Once StarPro became reliant upon Challenger Turf/TenCate North America for the MPT

putting turf; ceasing to provide the MPT putting turf to StarPro was done with malice and forethought and removed a competitor thus harming consumers.

87.    Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

88.    Challenger Turf/TenCate North America's exclusionary conduct has foreclosed a substantial share of the cross-over stitched putting turf do-it-yourself installer market.

89.    Challenger Turf/TenCate North America has the power to exclude competition by being the sole manufacturer of MPT putting turf accessible to StarPro and excluding StarPro from the MPT putting turf product after luring StarPro to rely on Challenger Turf/TenCate North America's agreement to provide the MPT putting turf illustrates Challenger Turf/TenCate North America's anticompetitive conduct by willfully acquiring the monopoly by terminating competition and doing so in a manner which it knew would put StarPro out of business, thus removing a competitor entirely.

90.     Challenger Turf/TenCate North America's anticompetitive acts have had harmful effects on competition and consumers.

91.     Challenger Turf/TenCate North America's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Challenger Turf/TenCate North America's anticompetitive and unlawful conduct.

***Second Claim for Relief, in the Alternative: Attempted Monopolization of the of the Cross-over stitched putting surfaces for do-it-yourself installers in Violation of Sherman Act § 2***

92.     Plaintiffs incorporate the allegations of paragraphs 1 through 91. above.

93.     Cross-over stitch putting surfaces for do-it-yourself installers with the manufacturer being in North Georgia is a relevant antitrust market, and Challenger Turf/TenCate North America has attempted to monopolize that market.

94.     Challenger Turf/TenCate North America has attempted to monopolize the market through an exclusionary course of conduct and the anticompetitive acts described herein. While each of Challenger Turf/TenCate North America's actions

increased, maintained, or protected its cross-over stitch putting surfaces for do-it-yourself installers the following exclusionary conduct—taken together—played a particularly important role in unlawfully attempt to establish a monopoly:

1. Terminating the Partnership with StarPro preventing the Consumer from acquiring MPT putting turf from StarPro resulting in higher prices to the consumer by the elimination of a source of the MPT putting turf product. The termination of the Partnership with StarPro was done in order to pursue the goal of dominance across cross-over stitched putting surface across the do-it-yourself installer market;

2. The exclusionary practice of removing a competitor in the do-it-yourself industry by luring StarPro into a relationship wherein StarPro relied upon Challenger Turf/TenCate North America to develop the MPT putting turf solely for StarPro such that Challenger Turf/TenCate North America was the sole source of MPT putting turf available to StarPro and once StarPro

became reliant upon Challenger Turf/TenCate North America for the MPT putting turf, ceasing providing the MPT putting turf to StarPro in hopes of running StarPro out of business and thus removing a competitor and harming consumers.

95.    Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

96.    In undertaking this course of conduct,  Challenger Turf/TenCate North America has acted with a specific intent to monopolize, and to destroy effective competition in the cross-over stitch putting turf market for the do-it-yourself installer market in the United States.

97.    Challenger Turf/TenCate North America's conduct has drastically altered the supply paths through which available cross-over stitch putting turf for the do-it-yourself installer is sold, limiting access, increasing costs, and inhibiting choice and innovation for the do-it-yourself installer market.

98.    Challenger Turf/TenCate North America's exclusionary conduct has foreclosed a substantial share of the cross-over stitched putting turf do-it-yourself

installer market and there exists a dangerous probability of Challenger Turf/TenCate North America achieving monopoly power.

99.    Challenger Turf/TenCate North America's anticompetitive acts have had harmful effects on competition and consumers.

100.    Challenger Turf/TenCate North America's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Challenger Turf/TenCate North America's anticompetitive and unlawful conduct.

**Third Claim for Relief: Monopolization of the MPT Putting Turf Market accessible to StarPro in Violation of Sherman Act § 2**

101.    Plaintiffs incorporate the allegations of paragraphs 1 through 100 above.

102.    Prior to StarPro entering into a Partnership with Challenger Turf/TenCate North America, no market existed for MPT putting turf product for the do-it-yourself installer.  Only StarPro had established this market but with no product to sell, this market dissolved.  To continue this market, StarPro Partnered with Challenger Turf/TenCate North America to create a market of a supplier of MPT putting turf accessible to StarPro.  The MPT accessible to StarPro is a

relevant antitrust market, and Challenger Turf/TenCate North America has monopoly power in that market.

103.   Challenger Turf/TenCate North America has unlawfully attempted to monopolize StarPro's market through an exclusionary course of conduct and the anticompetitive acts described herein. While each of Challenger Turf/TenCate North America's actions collectively increased, maintained, or protected its ad exchange monopoly and/or market power in adjacent markets, the following exclusionary conduct—taken together— played a particularly important role in unlawfully attempting to establishing a monopoly:

1.   Terminating the Partnership with StarPro thus preventing StarPro from acquiring MPT putting turf and hence eliminating competition in the putting turf market by putting StarPro out of business.  Challenger Turf was the sole source of MPT accessible to StarPro.  The termination of the Partnership with StarPro was done in order to pursue the goal of dominance across cross-over stitched putting surface across the

do-it-yourself installer market.

2.   The exclusionary practice of removing a competitor in the do-it-yourself industry by luring StarPro into a relationship wherein StarPro relied upon Challenger Turf/TenCate North America to develop the MPT putting turf solely for StarPro and wherein Challenger Turf/TenCate North America was the sole source of MPT putting turf available to StarPro. Once StarPro became reliant upon Challenger Turf/TenCate North America for the MPT putting turf; ceasing to provide the MPT putting turf to StarPro was done with malice and forethought and removed a competitor thus harming consumers.

104.   Although each of these acts is anticompetitive in its own right, these interrelated and interdependent actions have had a cumulative and synergistic effect that has harmed competition and the competitive process.

105.   Challenger Turf/TenCate North America's exclusionary conduct has totally eliminated the MPT market accessible to StarPro and foreclosed a substantial share of the cross-over stitched putting turf do-it-yourself installer market.

106.   Challenger Turf/TenCate North America has the power to exclude competition by being the sole manufacturer of MPT putting turf accessible to StarPro and excluding StarPro from the MPT putting turf product after luring StarPro to rely on Challenger Turf/TenCate North America's agreement to provide the MPT putting turf illustrates Challenger Turf/TenCate North America's anticompetitive conduct by willfully acquiring the monopoly by terminating competition.

107.   Challenger Turf/TenCate North America's anticompetitive acts have had harmful effects on competition and consumers. Challenger Turf/TenCate North America's  exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Challenger Turf.

**Fourth for Relief, in the Alternative: Attempted**
**Monopolization of the of the MPT putting surfaces accessible**
**to StarPro in Violation of Sherman Act § 2**

108.   Plaintiffs incorporate the allegations of paragraphs 1 through 107 above.

109.   Cross-over stitch putting surfaces accessible for the purchase by StarPro with the manufacturer being in North Georgia is a relevant antitrust market, and Challenger Turf/TenCate North America has attempted to monopolize that market.

110.   Challenger Turf/TenCate North America has attempted to monopolize the market through an exclusionary course of conduct and the anticompetitive acts described herein. While each of Challenger Turf/TenCate North America's actions increased, maintained, or protected its cross-over stitch putting surfaces for do-it-yourself installers the following exclusionary conduct—taken together—played a particularly important role in unlawfully attempt to establish a monopoly:

1.  Terminating   the   Partnership   with   StarPro preventing StarPro from acquiring MPT putting turf and hence eliminating competition in the putting turf market by putting StarPro out of business.  Challenger Turf was the sole source of MPT accessible to StarPro. The termination of the Partnership with StarPro was done in order to pursue the goal of dominance across cross-over

stitched putting surface across the do-it-yourself
installer market;

2.  The exclusionary practice of removing a
competitor in the do-it-yourself industry by
luring StarPro into a relationship wherein StarPro
relied upon Challenger Turf/TenCate North
America to develop the MPT putting turf solely
for StarPro and wherein Challenger Turf/TenCate
North America was the sole source of MPT
putting turf available to StarPro and once StarPro
became reliant upon Challenger Turf/TenCate
North America for the MPT putting turf, ceasing
providing the MPT putting turf to StarPro and
thus removing a competitor and harming
consumers.

111.   Although each of these acts is anticompetitive in its own right, these
interrelated and interdependent actions have had a cumulative and synergistic
effect that has harmed competition and the competitive process.

112.   In undertaking this course of conduct, Challenger Turf/TenCate North
America  has acted with a specific intent to monopolize, and to destroy effective

competition in the cross-over stitch putting turf market for the do-it-yourself installer market in the United States.

113.   Challenger Turf/TenCate North America's conduct has drastically altered the supply paths through which available cross-over stitch putting turf for the do-it-yourself installer is sold, limiting access, increasing costs, and inhibiting choice and innovation for the do-it-yourself installer market.

114.   Challenger Turf/TenCate North America's exclusionary conduct has completely removed the MPT putting turf accessible to StarPro and foreclosed a substantial share of the cross-over stitched putting turf do-it-yourself installer market and there exists a dangerous probability of Challenger Turf/TenCate North America achieving monopoly power.

115.   Challenger Turf/TenCate North America's anticompetitive acts have had harmful effects on competition and consumers.

116.   Challenger Turf/TenCate North America's exclusionary conduct lacks a procompetitive justification that offsets the harm caused by Challenger Turf/TenCate North America's anticompetitive and unlawful conduct.

**Fifth Claim for Relief: Defendants Challenger Turf and Tencate North America Breached their Duties of Good Faith, Fair Dealing and Loyalty owed to StarPro, Greens, Inc. as a Partner with Tencate North America and Challenger Turf regarding the MPT putting turf market for Do-it-Yourself Installers**

117.    Plaintiffs incorporate the allegations of paragraphs 1 through 116 above.

118.    A partnership is an association of two or more persons to carry on as co-owners a business for profit and includes, for all purposes of the laws of this state, a limited liability partnership.  O.C.G.A. 14-8-6.

119.    StarPro, TenCate North America and Challenger Turf formed a Partnership regarding the creation of MPT putting turf for the do-it-yourself Installer market.  StarPro provided the market incentive for TenCate North America and Challenger Turf and TenCate North America to work with StarPro in developing MPT putting turf.  StarPro agreed to utilize its expertise in marketing the MPT putting turf and assist Challenger Turf in creating the MPT putting turf.  Challenger Turf with StarPro consulting created the MPT putting turf.  TenCate North America provided warehousing, cutting and shipping services.  These three entities met at a meeting and agreed upon this arrangement with anticipated revenue devised by the

selling of MPT putting turf by StarPro to the do-it-yourself installer market. Revenue was shared by the entities when a sell to the respective do-it-yourself installer remitted payment to StarPro for the MPT manufactured by Challenger Turf and the warehousing and shipping of the product was conducted by TenCate North America.

120.    In a partnership, each partner has a legal duty to act in the partnership's best interests, as well as the best interest of the other partners. Partners in a partnership must be able to trust and rely on their fellow partners for promoting the success and best interests of the business. Their relationship is built on good faith, honesty, loyalty, and fairness.  They're held to high standards of care, and their duties include acting for the common benefit of all partners in business matters and refraining from taking advantage of other partners.

121.    Defendants Challenger Turf and TenCate North America breached their duties of Good Faith, Loyalty and Fair Dealings owed to StarPro when Defendants ceased providing MPT to StarPro in 2022 resulting in StarPro being forced out of business.

122.    Defendants Challenger Turf  and TenCate North America knew that ceasing to provide MPT to StarPro in 2022 would result in StarPro being forced out of business.

123.   Defendants Challenger Turf and TenCate North America acted maliciously and wantonly and their actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences to StarPro Greens and Daniel E. Selton and an award of punitive damages is being specifically prayed for in this complaint pursuant to O.C.G.A 51-12-5.1(a), (b) and (d1).

124.   As a result of Defendants Challenger Turf and TenCate North America's breach, StarPro Greens suffered significant injury to the good will of the business.  This injury to the good will has significantly injured the valuation of StarPro.  Due to Daniel E. Selton's age, the selling of the StarPro business was imminent in the next few years.  The loss in the valuation of the business and the probable inability to resuscitate the value in the near time frame is a special damage to StarPro and Daniel E Selton.

> **Sixth Claim for Relief: Defendants Challenger Turf and TenCate North America Breached their Fiduciary Duties owed to StarPro, Greens, Inc. regarding the MPT putting turf market for Do-it-Yourself Installers due to the confidential relationship which existed between the Parties**

125.   Plaintiffs incorporate the allegations of paragraphs 1 through 124 above.

126.  Defendants Challenger Turf and Tencate North America held a position wherein a confidential relationship between Challenger Turf, Tencate North America existed with StarPro.

127.  Pursuant to O.C.G.A. 23-2-58 (2022)

Any relationship shall be deemed confidential, whether arising from nature, created by law, or resulting from contracts, where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners; principal and agent; guardian or conservator and minor or ward; personal representative or temporary administrator and heir, legatee, devisee, or beneficiary; trustee and beneficiary; and similar fiduciary relationships.

128.  Defendant Challenger Turf is a multi-million dollar manufacturer of synthetic turf materials.   Challenger Turf is only one of a few entities in North Georgia having the capabilities to manufacture MPT putting turf.  At the time of the initial meeting between Challenger Turf, TenCate North America and StarPro, no manufacturing entity in North Georgia manufactured the MPT putting turf for the do-it-yourself installer and no entity was willing to manufacture the MPT for StarPro.

129.  Defendant Challenger Turf not only being a Partner with StarPro, was so situated as to exercise a controlling influence over the will, conduct, and interest of StarPro be controlling the availability of MPT putting turf to StarPro once

StarPro agreed to Partner with Challenger Turf. StarPro lacked the ability to acquire MPT Putting turf from any source other than Challenger Turf. Hence, Challenger Turf directly controlled the StarPro business by manipulating access to the primary product which StarPro was known for, the MPT putting turf.

130. Challenger Turf breached its fiduciary duties owed to StarPro when it escalated the price of the MPT putting turf.

131. Challenger Turf and Tencate North America breached its fiduciary duties owed to StarPro when it ceased providing MPT putting turf to StarPro, effectively putting StarPro out of business.

132. Challenger Turf and Tencate Noth America knew that by denying StarPro access to MPT, that such actions would put StarPro out of business. Defendant Challenger Turf and TenCate North America acted maliciously and wantonly and their  actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences to StarPro Greens and Daniel E. Selton and an award of punitive damages is being specifically prayed for in this complaint pursuant to O.C.G.A 51-12-5.1(a), (b) and (d1).

133.  As a result of Defendants Challenger Turf and TenCate North America's breach, StarPro Greens suffered significant injury to the good will of the

business.  This injury to the good will has significantly injured the valuation of StarPro.  Due to Daniel E. Selton's age, the selling of the StarPro business was imminent in the next few years.  The loss in the valuation of the business and the probable inability to resuscitate the value in the near time frame is a special damage to StarPro and Daniel E Selton.

### Seventh Claim for Relief: Defendant Challenger Turf and TenCate North America Breached their Supply Agreement with StarPro, Greens, Inc. regarding the MPT putting turf market for Do-it-Yourself Installers

134.   Plaintiffs incorporate the allegations of paragraphs 1 through 133 above.

135.   As an alternative, Challenger Turf and TenCate North America entered into a supply agreement with StarPro to supply StarPro with StarPro's required production of MPT for the year 2022.

136.  Challenger Turf and TenCate North America breached this supply agreement by terminating the supply of MPT putting turf to StarPro in 2022.

### *Eighth Claim for Relief: Defendant Challenger Turf Converted StarPro MPT*

137**.**   Plaintiffs incorporate the allegations of paragraphs 1 through 136 above.

138.   The standard business practice between the parties involved StarPro direction Challenger Turf to manufacture MPT.  StarPro would inspect the MPT run and the MPT run would be available for StarPro to place individual do-it-yourself orders against this MPT inventory.  Challenger Turf understood and knew that each MPT run was specifically the sole property of StarPro.

139.   On one occasion, one specific run which had been inspected and approved by StarPro was removed from StarPro's inventory and converted by Challenger Turf and sold to a third entity.  When StarPro placed do-it-yourself orders against this inventory, StarPro was informed that the inventory did not exist.

140. Challenger Turf's conversion of StarPro's inventory caused significant damage to StarPro's reputation as do-it-yourself orders taken by StarPro under the presumption that MPT inventory existed had to be revoked damaging the good will of StarPro with these respective customers.

**Ninth Claim for Relief: Defendant Challenger Turf committed Fraud when enticing StarPro to order MPT from Challenger Turf in 2023.**

141**.**   Plaintiffs incorporate the allegations of paragraphs 1 through 140 above.

142.   In 2023, after terminating the relationship with StarPro in 2022, Challenger Turf requested that StarPro again become a customer.  StarPro specifically identified that StarPro would only purchase MPT (or as identified by Challenger Turf internal identification).  Challenger Turf responded that MPT putting turf was propriety to their Envylawn business and would not be made available to StarPro.  StarPro informed Challenger Turf that StarPro consequently would not become a customer of Challenger Turf.  Challenger Turf subsequently reevaluated their position and informed StarPro that Challenger Turf would make MPT putting turf available to StarPro.

143.  Upon the representation by Challenger Turf that MPT putting turf would be available to StarPro, StarPro initiated a purchase order to Challenger Turf for the MPT.  Challenger Turf specifically communicated to StarPro upon receipt of the purchase order that MPT or MPT like product was the subject of the purchase order and would be made available to StarPro.

144. Based on the representations of Challenger Turf which StarPro relied upon, StarPro took in and received orders from do-it-yourself installers for MPT putting turf.

145. StarPro was notified by Challenger Turf that the purchase order had been fulfilled for MPT putting turf. However, upon inspection by StarPro it became quickly evident that the putting turf was not MPT putting turf and was of significantly lesser quality. Due to this product not being MPT and of significantly inferior quality, StarPro customers returned a significant amount this non-MPT putting turf resulting in damage to StarPro.

146. Pursuant to O.C.G.A. 51-6-2 (2022)

a. Willful misrepresentation of a material fact, made to induce another to act, upon which such person acts to his injury, will give him a right of action. Mere concealment of a material fact, unless done in such a manner as to deceive and mislead, will not support an action.
b. In all cases of deceit, knowledge of the falsehood constitutes an essential element of the tort. A fraudulent or reckless representation of facts as true when they are not, if intended to deceive, is equivalent to a knowledge of their falsehood even if the party making the representation does not know that such facts are false.

147. Upon information and belief, Challenger Turf made a misrepresentation of material fact that MPT putting turf would be available to StarPro, such statement was made to induce StarPro to place an order, which StarPro did, and with the denial

of the MPT putting turf StarPro suffered damage.  Challenger Turf knew that the

statement that MPT putting turf would be made available to  StarPro was false.

148.   Challenger Turf knew that by enticing StarPro access to MPT putting

turf  while subsequently denying MPT putting turf  to StarPro, that such actions

would put StarPro out of business in 2023.  Defendant Challenger Turf acted

maliciously and wantonly and their actions showed willful misconduct, malice,

fraud, wantonness, oppression, or that entire want of care which would raise the

presumption of conscious indifference to consequences to StarPro Greens and

Daniel E. Selton and an award of punitive damages is being specifically prayed for

in this complaint pursuant to O.C.G.A 51-12-5.1(a), (b) and (d1).

> ### Tenth Claim for Relief: Defendant Challenger Turf has breached the contract with StarPro regarding MPT and breached its warranty in the sale of Putting Turf to StarPro in 2023.

149**.**   Plaintiffs incorporate the allegations of paragraphs 1 through 148

above.

150.   In 2023, after terminating the relationship with StarPro in 2022,

Challenger Turf requested that StarPro again become a customer.  StarPro

specifically identified that StarPro would only purchase MPT putting turf (or as

identified by Challenger Turf internal identification).  Challenger Turf responded

that MPT putting turf was propriety to their Envylawn business and would not be made available to StarPro.  StarPro informed Challenger Turf that StarPro consequently would not become a customer of Challenger Turf.  Challenger Turf subsequently reevaluated their position and informed StarPro that Challenger Turf would make MPT putting turf available to StarPro.

151.  Upon the representation by Challenger Turf that MPT putting turf would be available to StarPro, StarPro initiated a purchase order to Challenger Turf for the MPT putting turf.  Challenger Turf specifically communicated to StarPro upon receipt of the purchase order that MPT or MPT like product was the subject of the purchase order and would be made available to StarPro.

152. Based on the representations of Challenger Turf which StarPro relied upon, StarPro took in and received orders from do-it-yourself installers for MPT putting turf.

153.  StarPro was notified by Challenger Turf that the purchase order had been fulfilled by MPT putting turf. However, upon inspection by StarPro it became quickly evident that the putting turf was not MPT putting turf and was of significantly lesser quality.

154.   The product sold by Challenger Turf was faulty.  Soon after receiving the substituted putting turf and filling all backorders, complaints came in regarding

the loss of integrity of the product.  The nylon fibers were inferior and "relaxed/straightened" thus destroying the integrity of the product because the stimp value slowed to approximately 7 on the stimp meter.  Seven on the stimp meter is unacceptable to golfers because the ball rolls too slowly for realistic putting.  The StarPro MPT putting turf normally was approximately 10 on the stimp meter (country club speed).   Based on the poor performance of the product, customers called StarPro, complaining and irate at being sold bad turf and requesting their money back, which StarPro did.  It is estimated that approximately 70% of all products sold from this fraudulently substituted and defective product  poor unacceptable product was rejected or returned.

155.  Challenger Turf when accepting the order or MPT putting turf material knew the expected performance requirements of the putting turf.  Challenger Turf knew the particular purpose of the putting turf and the expected stimp functionality.

156.   StarPro met with Challenger Turf to discuss the unacceptable substitution of product and requested reimbursement for the bad turf.   Challenger Turf has refused to refund the money for the bad turf or honor its factory warranty. Due to this product not being MPT putting turf and of significantly inferior quality, StarPro customers returned a significant amount this non-MPT putting turf resulting in damage to StarPro.

157.   Challenger Turf has breached the contract by not delivering the MPT as discussed and identified in the PO and also breached the warranty of the performance of the product, the implied warranty of merchantability and the implied warranty of fitness for a particular purpose.  O.C.G.A. 11-2-314; 315

### Eleventh Claim for Relief: Defendant Challenger Turf has breached the contract and duty of good faith in the sale of Putting Turf to StarPro in 2023.

158.   Plaintiffs incorporate the allegations of paragraphs 1 through 157 above.

159.   Every contract in Georgia incorporates a duty of good faith in its performance.

160.  Pursuant to O.C.G.A. 13-4-20 (2022)

Performance, to be effectual, must be accomplished by the party bound to perform, or by his agent where personal skill is not required, or by someone substituted, by consent, in his place, and must be substantially in compliance with the spirit and the letter of the contract and completed within a reasonable time.

161.   Challenger Turf's acceptance of the purchase order from StarPro for MPT putting turf identifies their acknowledgement that StarPro was to receive MPT putting turf having the specific characteristics of MPT putting turf such as a specific stimp value and cross over stitching.  The failure of Challenger Turf to knowingly not only not provide MPT putting turf to StarPro, but to substitute a product of such inferior quality is a clear violation of Challenger Turf acting in

good faith in honoring their obligation of their contractual performance.

Challenger Turf knew that by failing to act in good faith in honoring their

obligations and substituting inferior product for MPT putting turf while

simultaneously delaying delivery of the ordered item which would force StarPro to

accept the inferior substituted product, that StarPro and its good will would be

injured due to the inferior quality of the substituted putting turf and that such actions

would put StarPro out of business in 2023.

162.   Defendant Challenger Turf's deliberate breach of its duty of good faith

in failing to perform its contractual obligations of delivering MPT putting turf acted

maliciously and wantonly and their  actions showed willful misconduct, malice,

fraud, wantonness, oppression, or that entire want of care which would raise the

presumption of conscious indifference to consequences to StarPro Greens and

Daniel E. Selton and an award of punitive damages is being specifically prayed for

in this complaint pursuant to O.C.G.A 51-12-5.1(a), (b) and (d1).

> ***Twelfth Claim for Relief: Defendant Challenger Turf and
> TenCate North America  has intentionally inflicted emotional
> duress to Daniel E. Selton***

163**.**    Plaintiffs incorporate the allegations of paragraphs 1 through 162

above.

164.   Daniel E. Selton is the sole shareholder of StarPro, Greens, Inc. and receives direct economic benefit from the corporation and its associated intellectual property of good will.  The damage done to the good will of StarPro, Greens, Inc. through the deeds of Challenger Turf and TenCate North America has directly impacted the property of Daniel E. Selton.

165.   The four elements which must be proved in order to sustain a claim of intentional infliction of emotional distress in Georgia are: (1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe.

166.   Defendants Challenger Turf's and TenCate North America's conduct has been intentional and reckless.  The conduct in intentionally acting in a manner to put a company out of business is extreme and outrageous.   The actions of Defendants is directly related to the distress and the distress encountered by Daniel E. Selton by losing his business has been severe.

167.   Defendants Challenger Turf and TenCate North America have acted maliciously and wantonly and their actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences to StarPro Greens and

Daniel E. Selton and an award of punitive damages is being specifically prayed for in this complaint pursuant to O.C.G.A 51-12-5.1(a), (b) and (d1).

### *Thirteenth Claim for Relief: Defendant Challenger Turf has been unjustly enriched by receiving profits from the sale of MPT product*

168.    Unjust enrichment is an equitable concept and applies when as a matter of fact there is no legal contract, but when the party sought to be charged has been conferred a benefit by the party contending an unjust enrichment which the benefitted party equitably ought to return or compensate for.

169.  Challenger Turf has been unjustly enriched by receiving profits received by the sale of the MPT product by Envylawn.  StarPro and Dan Selton helped create the MPT for Challenger Turf based on the premise and consideration that Challenger Turf would provide the MPT to StarPro.

170.    Challenger Turf ceased to provide the MPT to StarPro and maintained the developed product solely for its own purposes and profits.

171.  This exclusionary practice unjustly enriched Challenger Turf by being the recipient of a product developed by StarPro under the guise that StarPro would be the recipient of their efforts in the development of the MPT putting turf.

172.  Challenger Turf received a benefit from StarPro, the MPT, which StarPro should be compensated for.  The planned compensation was the provision of the MPT to StarPro.  However, when Challenger Turf unilaterally terminated this condition, the agreed upon consideration was removed, hence unjustly profiting Challenger Turf with a product which it received profits from ad which StarPro as the developer of the product should be entitled to.

V.    REQUEST FOR RELIEF

To remedy these illegal acts, Plaintiffs request that the Court:

1.    Adjudge and decree that Defendants have acted unlawfully to monopolize the MPT market in North Georgia in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

2.    Adjudge and decree that Defendants have acted unlawfully to monopolize, or, in the alternative, attempt to monopolize, the MPT market in North Georgia in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

3.    Adjudge and decree that Defendants have acted

unlawfully to monopolize the StarPro MPT market in North Georgia in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

4.    Adjudge and decree that Defendants have acted unlawfully to monopolize or, in the alternative, attempt to monopolize, the StarPro MPT market in North Georgia in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

5.    Award damages pursuant to 15 U.SC. § 15a

6.    Adjudge and decree that Defendants have formed a Partnership with Plaintiff Star Pro and that Defendants have breached their Duties of Good Faith, Fair Dealing and Loyalty owed to StarPro.

7.    Award Damages commensurate with the damages sustained by StarPro due to the Breach of the Duties of Good Faith, Fair Dealing and Loyalty of Defendants.

8.    Adjudge and decree that Defendants in Breaching

their Duties of Good Faith, Fair Dealing and Loyalty owed to StarPro acted maliciously and wantonly and their actions showed willful misconduct, malice, fraud, wantonness, and oppression to such an extent that an award of Punitive Damages pursuant to O.C.G.A. 51-12-5.1(a), (b) and (d1) be awarded.

9. Adjudge and decree that Defendants had a Confidential Relationship with StarPro and breached their Fiduciary Duties owed to StarPro because of the Confidential Relationship.

10. Award Damages commensurate with the damages sustained by StarPro due to the Breach of the Fiduciary duties of Defendants.

11. Adjudge and decree that Defendants in Breaching their Fiduciary Duties acted maliciously and wantonly and their actions showed willful misconduct, malice, fraud, wantonness, and oppression to such an extent that an award of Punitive Damages pursuant to O.C.G.A. 51-12-5.1(a), (b) and (d1) be awarded.

12. Adjudge and decree that Defendants had agreed to

provide MPT to StarPro pursuant to a Supply

Agreement  and Defendants breached this Supply

Agreement.

13.  Award Damages commensurate with the damages

sustained by StarPro due to the Breach of the Supply

Agreement including all actual damages, direct

damages, incidental damages and consequential

damages.

14.  Adjudge and decree that Defendants Converted MPT

intended for StarPro for their own use.

15.  Award Damages commensurate with the damages

sustained by StarPro due to the Converted MPT

including all actual damages, direct damages,

incidental damages and consequential damages.

16.  Adjudge and decree that Defendant Challenger Turf

committed Fraud when enticing StarPro to order MPT

from Challenger Turf  in 2023.

17.  Adjudge and decree that Defendant Challenger Turf

in committing fraud acted maliciously and wantonly

and their actions showed willful misconduct, malice,

fraud, wantonness, and oppression to such an extent
that an award of Punitive Damages pursuant to
O.C.G.A. 51-12-5.1(a), (b) and (d1) be awarded.

18. Award Damages commensurate with the damages
sustained by StarPro due to the Fraud committed by
Challenger Turf including all actual damages, direct
damages, incidental damages and consequential
damages.

19. Adjudge and decree that Defendant Challenger Turf
has breached its warranty in the sale of Putting Turf to
StarPro in 2023.

20. Award Damages commensurate with the damages
sustained by StarPro due to the Breach of Warranty
committed by Challenger Turf including all actual
damages, direct damages, incidental damages and
consequential damages.

21. Adjudge and Decree that Defendant Challenger Turf
has breached the contract and the duty of good faith in
the sale of Putting Turf to StarPro in 2023.

22. Adjudge and decree that Defendant Challenger Turf in

breaching its duty of good faith in the sale of Putting

Turf to StarPro in 2023 acted maliciously and

wantonly and their actions showed willful

misconduct, malice, fraud, wantonness, and

oppression to such an extent that an award of Punitive

Damages pursuant to O.C.G.A. 51-12-5.1(a), (b) and

(d1) be awarded.

23.    Award Damages commensurate with the damages

sustained by StarPro due to the Breach of its duty of

good faith by Challenger Turf including all actual

damages, direct damages, incidental damages and

consequential damages.

24.    Adjudge and Decree that Defendants Challenger Turf

and TenCate North America  have intentionally

inflicted emotional duress to Daniel E. Selton.

25.    Adjudge and decree that Defendants  Challenger Turf

and TenCate North America in intentionally inflicting

emotion duress to Daniel E. Selton acted maliciously

and wantonly and their actions showed willful

misconduct, malice, fraud, wantonness, and

oppression to such an extent that an award of Punitive Damages pursuant to O.C.G.A. 51-12-5.1(a), (b) and (d1) be awarded.

26. Award Damages commensurate with the damages sustained by Daniel E. Selton from the intentional infliction of emotional duress by Challenger Turf and TenCate North America including all actual damages, direct damages, incidental damages and consequential damages.

27. Decree and adjudge that Defendant Challenger Turf has been unjustly enriched by receiving profits from the sale of MPT product.

28. Award Damages to StarPro based upon the profits Defendant Challenger Turf has received by being unjustly enriched by receiving profits from the Sale of MPT product.

29. Award damages to StarPro based on the loss of good will sustained by the actions of Challenger Turf and TenCate North America.

30. Award special damages in the loss of the business value

to StarPro due to the actions of Challenger Turf and

TenCate North America which have caused a

significantly lower base profit value of the business

when utilized in conjunction with a multiplying value to

establish the value of business.

31. Enter any additional relief the Court finds just and

proper; and

32. Award an amount equal its costs, including reasonable

attorneys' fees incurred in bringing this action by

Plaintiff.

## VI.  DEMAND FOR A JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury

of all issues properly triable to a jury in this case

s/ Gerald R Boss

Gerald R. Boss
**Boss Law Group. LLC**
5531 Woodsong Trail
Dunwoody, GA 30338
Telephone (404) 213-4024
Georgia Bar No. 068775
gtbsgajd@gmail.com
Attorney for Plaintiff